T.C. Memo. 2002-155

UNITED STATES TAX COURT

HENRY C. BOLER AND SHERRY M. BOLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

AIM CONSTRUCTION, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10729-99, 10733-99.    Filed June 18, 2002.

<u>Elliot G. Mestayer</u>, for petitioners.

<u>Linda J. Wise</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and accuracy-related penalties as
follows:

Henry C. Boler and Sherry M. Boler

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|------------|---------------------------------------|
| 1994 | $1,563 | $313 |
| 1995 | 945 | 189 |
| 1996 | 630 | 126 |

AIM Construction, Inc.

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|------------|---------------------------------------|
| 1994 | $10,417 | $2,083 |
| 1995 | 5,132 | 1,026 |
| 1996 | 6,888 | 1,378 |

AIM Construction, Inc. (AIM), is petitioner's wholly owned corporation.[1]

After concessions, the issues for decision are:

1. Whether amounts AIM paid to Henry C. Boler (petitioner) ($16,599 in 1994, $21,460 in 1995, and $9,640 in 1996) are interest, as petitioners contend, or constructive dividends, as respondent contends. We hold that those payments are constructive dividends.

2. Whether AIM may deduct $14,900 in 1996 as a bad debt. We hold that it may.

---

[1] Section references are to the Internal Revenue Code in effect for the applicable years. Rule references are to the Tax Court Rules of Practice and Procedure.

3. Whether AIM's cost of goods sold for 1994 is $103,415, as petitioners contend, or $85,883, as respondent contends. We hold that it is $85,883.

4. Whether AIM may deduct $442 in 1994, $40 in 1995, and $243 in 1996 for reimbursement of petitioner's payments to high school students for work they performed for AIM. We hold that it may, and that these payments are not constructive dividends to petitioner.

5. Whether AIM may deduct $236 in 1995 and $369 in 1996 for reimbursement of petitioner's golf expenses. We hold that it may not, and that these payments are constructive dividends to petitioner.

6. Whether AIM may deduct $288 in 1994, $390 in 1995, and $322 in 1996 for reimbursement of petitioners' payments of employee meal expenses. We hold that it may, and that those amounts are not constructive dividends to petitioner.

7. Whether AIM may deduct $4,200 in 1994 for Sherry M. Boler's (Mrs. Boler) travel expenses. We hold that it may not.

8. Whether AIM may deduct the following reimbursements paid to petitioner in 1995: $1,254 recorded in AIM's journal as GJ1 18308, $600 recorded as GJ1 00172, and $480 recorded as GJ1

00174.  We hold that it may not, and that the $1,254 payment is a constructive dividend to petitioner.[2]

9.  Whether petitioners are liable for the accuracy-related penalty for negligence under section 6662(a).  We hold that they are to the extent described below.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioners

Petitioner and Mrs. Boler (the Bolers) are married and resided in Mississippi when they filed the petition.

AIM's principal place of business was in Mississippi when the petition was filed.  AIM was incorporated in 1990. Petitioner has been the sole shareholder of AIM since December 31, 1990.  AIM began doing business in February 1992.  AIM is a calendar-year, accrual basis taxpayer.  The Bolers were the only members of AIM's board of directors from 1992 through the date of trial.  The Bolers sometimes paid AIM's expenses with their personal funds and received reimbursements from AIM.  Mrs. Boler maintained records of the amount of reimbursements AIM owed to the Bolers.

---

[2]  Respondent concedes that the $600 and $480 payments are not constructive dividends.

AIM's primary business is metal fabrication.  AIM performs work at the facility on the Whittington property (described below at paragraph B) and at its customers' locations.

AIM paid its employees once a week.  AIM reported income on the basis of bills it submitted to customers.

AIM fabricated and installed metal components for Morton International, one of AIM's customers.  In October, November, and December 1994, AIM paid a total of $1,739.50 for materials and $15,792.40 to its employees for labor that they had performed for Morton International.  In January 1995, AIM completed the job and sent bills to Morton International for $17,532.

B.   The Whittington Property

On March 6, 1978, petitioner bought about 2.75 acres (the Whittington property) from D.L. Whittington.

On January 1, 1992, AIM's board of directors (i.e., the Bolers) held a meeting to accept the transfer of real property, equipment and tools, and associated liabilities from petitioner. The record is silent as to whether AIM's board of directors accepted the proposed transfers from petitioner.  On March 11, 1992, petitioner signed a quitclaim deed which stated that he had transferred the Whittington property to AIM on January 1, 1992. AIM did not record the quitclaim deed.

C.    The Promissory Note

On December 31, 1992, petitioner signed a promissory note on behalf of AIM which stated that AIM would pay $121,596 to petitioner on demand, with interest to be paid annually at 10 percent beginning on December 31, 1994, and ending December 31, 2000.

AIM reported on its 1992 income tax return that it had $121,596 in loans from stockholders.  AIM did not report any loans from stockholders on its 1990 or 1991 return.

D.    References to the Whittington Property and Related Debt in AIM's Financial Statements

1.    Application to the Mississippi Board of Contractors

On May 26, 1992, John C. Trussell III (Trussell), one of petitioners' certified public accountants, prepared a balance sheet for AIM.  It stated that, on February 29, 1992, AIM owned real estate worth $89,862 and owed $30,000 for "loans due to stockholder."  The balance sheet did not state that AIM owed money to petitioner relating to the Whittington property.  On May 29, 1992, AIM applied to the Mississippi State Board of Contractors for a certificate of responsibility.  AIM included in its application the balance sheet and a financial statement prepared by Trussell that contained the information shown on the balance sheet.

2.  Applications to the Alabama Licensing Board for General Contractors

Around May 29, 1992, AIM applied to the Licensing Board for General Contractors for the State of Alabama (Alabama Board) for a license.  AIM included with its license application a financial statement which listed assets of $130,929, including real estate worth $90,000, a $30,000 liability for a "stockholder loan-working capital", and a net worth of $100,929.  A licensee may bid on contracts up to 10 times the licensee's net worth.  The Alabama Board licensed AIM to bid on contracts worth $1,009,290.

Petitioner applied to renew AIM's license in December 1993. He enclosed a balance sheet as of December 31, 1992, that showed that AIM had assets of $135,339, including real estate worth $90,000, shareholder liabilities of $37,046, and a net worth of $96,877.

AIM did not report that it owed money to petitioner related to AIM's acquisition of the Whittington property.

3.  Citizens National Bank

Petitioner submitted five loan applications to Citizens National Bank from March 19, 1989, to November 11, 1992.  AIM submitted three loan applications to Citizens National Bank during that period.  On the Bolers' application dated November 11, 1992, petitioner listed a $20,317 real estate mortgage liability, which he explained as follows:  "assets transferred to

AIM Corp.  Clay Boler retained liability of mortgage".  On AIM's application dated November 11, 1992, petitioner listed a $30,000 liability for "Loans due Clay Boler" and assets of $188,788, including the Whittington property worth $90,000.  The application indicated that the Whittington property had been transferred to AIM and that AIM had not paid anything for it.  Petitioner signed financial statements which were submitted with each of those loan applications.  None of the financial statements showed that AIM owed petitioner for the purchase of the Whittington property.

E.    AIM's Payments to James Scott

Petitioner and James Scott (Scott) had been friends for many years before the years in issue.  Scott began working for AIM around June 1992, as a supervisor and cost estimator.  He was also the liaison for AIM's largest customer.

AIM paid the following amounts to Scott in addition to his wages because he had some unforeseen personal needs:

| Date | Description on check | Description in books | Amount |
|------|---------------------|---------------------|--------|
| Aug. 15, 1994 | Loan to James Scott | Loans to shareholder | $1,000 |
| Sept. 23, 1994 | Employee loan | Loans to shareholder | 1,000 |
| Oct. 4, 1994 | Employee loan | Loans to shareholder | 2,200 |
| Nov. 4, 1994 | Employee loan | Loans to shareholder | 1,000 |
| May 9, 1995 | Employee loan | Accts. rec'ble--other | 1,500 |
| Aug. 10, 1995 | Employee loan | Accts. rec'ble--other | 2,200 |
| Aug. 21, 1995 | Employee loan | Accts. rec'ble--other | 6,000 |
| | | Total | 14,900 |

Petitioner and Scott did not discuss whether Scott was required to pay interest. Scott left AIM early in 1996 without repaying any of the $14,900. When he left AIM, Scott told petitioner that Scott considered the $14,900 to be compensation for work he had done for AIM. AIM did not deduct the $14,900 as compensation paid to Scott.

Petitioner did not sue Scott because litigation is expensive, and Scott had been a friend. In October 1996, petitioner asked Rebecca Hennesey, one of petitioners' certified public accountants, for advice about whether AIM could deduct the $14,900. She advised petitioner to contact Scott to try to collect the $14,900. One of Scott's sisters gave petitioner an address for Scott. On December 18, 1996, petitioner sent a certified letter to Scott at that address asking him to repay the loans. The letter was returned unclaimed. AIM deducted the $14,900 as a bad debt in 1996.

F. Labor Performed by High School Students

Some high school students maintained the lawn and premises at the Whittington property in the summers of the years in issue. Petitioner paid them $442 in 1994, $40 in 1995, and $243 in 1996. AIM reimbursed petitioner and deducted those amounts.

G.    Other Payments by AIM

AIM reimbursed petitioner $144 in 1994, $195 in 1995, and $161 in 1996 for the cost of providing meals to AIM employees. Neither petitioner nor Mrs. Boler ate any of those meals.

Petitioner did not play golf often, and he played only with clients.  Petitioner submitted claims to AIM for reimbursement for one-half of the golfing fees he paid.  He received $236 for 1995 and $369 for 1996.

Mrs. Boler used her car to run errands for AIM.  In 1994, AIM deducted $4,200 more than respondent allowed for travel expenses by AIM employees.  The record is silent as to whether any AIM employees incurred travel expenses in 1994.

In 1995, AIM reimbursed petitioner $1,254, which is coded in an AIM journal as GJ1 18308, $600 coded as GJ1 00172, and $480 coded as GJ1 00174.  Petitioners did not indicate the purpose of the payments.  AIM deducted these amounts in 1995 as business expenses.

AIM deducted interest expense of $24,416 for 1994, $24,840 for 1995, and $13,020 for 1996, and the Bolers reported those amounts as interest income.  Respondent disallowed interest deductions of $16,599 in 1994, $21,460 in 1995, and $9,640 in 1996.

OPINION

A.   Whether Amounts That AIM Paid to Petitioner Are Interest or Dividends

Respondent contends that the payments in dispute, that is, $16,599 for 1994, $21,460 for 1995, and $9,640 for 1996 (the interest at issue), are not deductible as interest by AIM and are constructive dividends to petitioner because there was no genuine debt on which AIM could accrue interest.  Petitioners contend that these amounts are interest that AIM paid to petitioner and not constructive dividends.

A taxpayer may deduct interest paid or accrued in a taxable year on bona fide indebtedness.  Sec. 163(a); Knetsch v. United States, 364 U.S. 361 (1960); In re W. Tex. Mktg. Corp., 54 F.3d 1194 (5th Cir. 1995).  Thus, we must decide whether the interest at issue was paid or accrued on bona fide indebtedness.  The essence of bona fide indebtedness is an unconditional and legally enforceable obligation for the payment of money.  Linder v. Commissioner, 68 T.C. 792, 796 (1977).

Petitioners contend that AIM accrued the interest at issue on a loan from petitioner the proceeds of which AIM used to buy the Whittington property from petitioner in early 1992. Petitioners bear the burden of proof on this issue.[3]

_____

[3]  Sec. 7491 applies to court proceedings arising in connection with examinations commencing after July 22, 1998.  The revenue agent's report is dated before July 22, 1998.  Thus, petitioners bear the burden of proof.  Rule 142(a)(1).

Rule 142(a)(1). We apply special scrutiny because petitioner had unfettered control over AIM. See Elec. & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970).

Petitioners contend that the December 31, 1992, promissory note is evidence of the alleged loan for the Whittington property and establishes a bona fide debt. We disagree.

The promissory note does not establish the existence of a bona fide debt, especially where, as here, there is documentary evidence (discussed below) in conflict with the note. See In re Lane, 742 F.2d 1311, 1315 (11th Cir. 1984); Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Tyler v. Tomlinson, 414 F.2d 844, 849 (5th Cir. 1969). Petitioner signed the note both as borrower and lender; there is no evidence that there were arm's-length negotiations. The note provides no fixed payment schedule or maturity date. It provides for annual payment of interest at a rate of 10 percent per year payable from December 31, 1994, to December 31, 2000. There is no evidence that petitioner and AIM had a written loan agreement or discussed security for the alleged loan, or that AIM maintained records of the alleged debt or recorded it on its books. There is no evidence that the note

was created when petitioner transferred any assets, including the Whittington property to AIM. We find that the promissory note does not establish that there was a genuine debt. In re Lane, supra; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra; Tyler v. Tomlinson, supra.

The balance sheets submitted by AIM to the Mississippi and Alabama licensing boards in 1992 and to Citizens National Bank show that shareholders had lent only $30,000 to AIM. Similarly, a balance sheet that AIM submitted to the Alabama licensing board in December 1993 shows that shareholders had lent only $37,406 to AIM. The only documents that state that AIM owed $121,596 to petitioner are the promissory note and AIM's 1992 tax return. AIM's 1992 return does not establish that AIM owed petitioner that amount because tax returns do not establish the truth of the facts stated in them. Lawinger v. Commissioner, 103 T.C. 428, 438 (1994); Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974). In deciding whether petitioner and AIM created a bona fide debt, we give more weight to the balance sheets than to the promissory note because the balance sheets were AIM's official representations of its assets and liabilities to Government agencies and to its bank.

Petitioners contend that we should ignore the balance sheets and statements that conflict with the note because petitioner was not knowledgeable about financial documents when they were

prepared. We disagree. AIM was licensed to bid on larger contracts because it did not disclose the alleged loan from petitioner to AIM in the financial statements AIM submitted to the Mississippi and Alabama licensing boards. Petitioner represented to Citizens National Bank that AIM had not paid anything to own the Whittington property. Petitioner's representation enhanced AIM's ability to borrow funds from Citizens National Bank. We do not ignore the balance sheets and statements that conflict with the note.

We conclude that petitioner and AIM did not create a bona fide debt. Thus, AIM's payments to petitioner of $16,599 in 1994, $21,460 in 1995, and $9,640 in 1996 are constructive dividends to petitioner and not deductible by AIM as interest.

B. Whether AIM May Deduct as a Bad Debt $14,900 It Paid to Scott

1. Whether the $14,900 That AIM Paid to Scott Was a Loan

AIM deducted as a bad debt in 1996 the $14,900 it paid to Scott. Respondent points out that there was no promissory note or provision for repayment and contends that the $14,900 was not a loan. We disagree.

A taxpayer may deduct a debt that becomes worthless in the taxable year. Sec. 166(a)(1); sec. 1.166-1(c), Income Tax Regs. Petitioner credibly testified that the $14,900 AIM paid to Scott was a loan. The notations on the checks and some of the entries

in AIM's books corroborate petitioner's testimony.[4]  Scott was a valuable employee of AIM who needed help.  Petitioner believed Scott would repay the $14,900.  We conclude that the $14,900 AIM paid to Scott was a loan.

2.    Whether the $14,900 Debt Became Worthless in 1996

To prevail, petitioners must identify some event or facts which prove that the debt became worthless in 1996.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 401 (1927); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).  Respondent contends that petitioners did not show that the $14,900 debt became worthless in 1996.  We disagree.

Disappearance of the debtor is a factor that can show that a debt has become worthless.  Cole v. Commissioner, 871 F.2d 64, 67 (7th Cir. 1989), affg. T.C. Memo. 1987-228; Briant v. Commissioner, T.C. Memo. 1982-397; Acree v. Commissioner, T.C. Memo. 1976-187.  Scott disappeared in 1996.  Petitioner tried unsuccessfully to find him.  Further evidence that the debt became worthless in 1996 is that Scott told petitioner when Scott

---

[4]  Petitioner described the payments to Scott as "Loans to shareholder" or "Accts. rec'ble - other" in AIM's books.  The four entries that state "Loans to shareholder" are at odds with petitioners' position.  However, the three entries that state "Accts. rec'ble - other" are consistent with the contemporaneous notations petitioner wrote on the checks and petitioner's testimony that AIM lent money to Scott.

left AIM in 1996 that Scott considered the $14,900 to be compensation. These facts show that the loan became worthless in 1996.

Respondent points out that petitioner did not sue Scott. However, to prove that a debt is worthless, a taxpayer is not required to sue to obtain repayment if, as here, the circumstances indicate that a lawsuit to enforce payment would probably not result in satisfaction of a judgment. Exxon Corp. v. United States, 785 F.2d 277, 279 (Fed. Cir. 1986); sec. 1.166-2(a) and (b), Income Tax Regs. We conclude that AIM may deduct the $14,900 as a bad debt in 1996.

C. Whether AIM Had Cost of Goods Sold of $103,415 in 1994

Petitioners contend that AIM's cost of goods sold for 1994 was $103,415. Respondent contends that it was $85,883. The difference of $17,532 relates to labor and material expenses AIM incurred for work it did for Morton International in 1994 and 1995. AIM paid those expenses in December 1994 and, in January 1995, completed the job and billed Morton International.

Deductions under the accrual method of accounting are allowable for the taxable year in which all events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability.

Sec. 461(h); secs. 1.446-1(c)(1)(ii)(A), 1.461-1(a)(2)(i), Income Tax Regs. Petitioners contend that AIM properly included the $17,532 in its cost of goods sold for 1994 because AIM was an accrual method taxpayer and the requirements of section 461(h) were satisfied in that all events establishing the fact and amount of the liability had occurred, and economic performance, i.e., AIM's payment of the $17,532, occurred in 1994.

Petitioners' contention that AIM's inclusion of $17,532 in cost of goods sold in 1994 satisfies section 1.461-1(a)(2)(i), Income Tax Regs., does not take into account section 263A. Section 1.461-1(a)(2)(i), Income Tax Regs., provides that, under section 263A, a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year must be capitalized in the taxable year incurred. Section 263A requires the capitalization of all direct and certain indirect costs properly allocable to property produced or acquired for resale. Sec. 263A; sec. 1.263A-1(e)(1), Income Tax Regs. The term "produce" means "construct, build, install, manufacture, develop, or improve." Sec. 263A(g)(1); see sec. 1.263A-2(a)(1)(i), Income Tax Regs. AIM produced property for Morton. "Direct costs" include "direct material costs and direct labor costs." Sec. 1.263A-1(e)(2)(i), Income Tax Regs. In 1994, AIM had direct costs of $15,795.40 for labor and $1,739.50 for materials. Thus, AIM must capitalize as direct

costs under section 263A its costs of $17,532 for labor and materials, and it may not reduce gross income by $17,532 in 1994. We conclude that AIM had cost of goods sold of $85,883 for 1994.[5]

D.    Labor by High School Students

Respondent contends that petitioner had constructive dividends of $442 in 1994, $40 in 1995, and $243 in 1996 and that AIM may not deduct these amounts because petitioners did not substantiate the amounts petitioner paid to high school students to maintain the lawn and premises at the Whittington property in the summers of the years in issue.  We disagree.  Petitioner credibly testified, and corroborated by contemporaneous records, that he paid high school students $442 in 1994, $40 in 1995, and $243 in 1996 to maintain AIM's premises.

Respondent points out that in Park v. Commissioner, T.C. Memo. 1994-343, we held that the taxpayer could not deduct labor expenses because he had no records to substantiate those payments.  We distinguish Park because, here, the contemporaneous expense reports that petitioner used to claim reimbursement corroborate his testimony.  The issue in Park was whether to estimate under Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), the amount the taxpayer paid for office help.  Here, we know the exact amounts of the labor expenses because petitioners

_____

[5]  Respondent concedes that AIM may reduce its 1995 gross receipts by $17,532 for costs of goods sold.

have records.  Thus, there is no need to estimate amounts under
Cohan.

We conclude that AIM may deduct $442 in 1994, $40 in 1995,
and $243 in 1996 for reimbursing petitioner for high school
student labor expenses.  Those amounts are not constructive
dividends to petitioner.

E.   Golf Expenses

AIM reimbursed petitioner for one-half of the expenses that
he incurred for golf in 1995 and 1996.  Petitioners contend that
AIM properly deducted AIM's reimbursement to petitioner of golf
expenses of $236 for 1995 and $369 for 1996.  We disagree.

Expenses of recreation and entertainment generally are
nondeductible unless the taxpayer substantiates by adequate
records, or by sufficient evidence corroborating his or her own
testimony:  (1) The amount of the expense; (2) the time and place
of the expense; (3) the business purpose of the expense; and (4)
the business relationship to the taxpayer of the persons
entertained.  Sec. 274(d); sec. 1.274-5T(c)(3), Temporary Income
Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985).  Petitioners
offered no evidence showing the place, the persons entertained,
the business purpose, or the business relationship to AIM of the
persons entertained.  Petitioners had no receipts.  Thus,
petitioners have not met the requirements of section 274(d).

We conclude that AIM may not deduct its reimbursements to petitioner for golf expenses he paid in 1995 and 1996.

Petitioners contend that AIM's reimbursements to petitioner for golf expenses are not constructive dividends to petitioner. We disagree. A shareholder receives a constructive dividend to the extent of the corporation's earnings and profits if the corporation pays a personal expense of its shareholder or the shareholder uses corporate property for a personal purpose. Secs. 301, 316; Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 743-744 (1973). Petitioners did not show that petitioner's golf expenses were not primarily personal. Thus, AIM's golf reimbursements to petitioner are constructive dividends. Petitioner testified that he played golf only with clients and that he was reimbursed by AIM for only one-half of the golf expenses. However, petitioners have not shown that the amounts petitioner was reimbursed were for clients' golf expenses.[6]

---

[6] Petitioners bear the burden of proving that AIM had insufficient earnings and profits to support the constructive dividend treatment. United States v. Bok, 156 F.3d 157, 163 (2d Cir. 1998); Pittman v. Commissioner, 100 F.3d 1308, 1318 (7th Cir. 1996), affg. T.C. Memo. 1995-243; Hagaman v. Commissioner, 958 F.2d 684, 695 n.16 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549. Petitioners did not contend and did not offer any evidence showing that AIM had insufficient earnings and profits to support constructive dividend treatment.

We conclude that AIM's reimbursements to petitioner for golf expenses in 1995 and 1996 are constructive dividends to petitioner.

F.   Meal Expenses

Petitioner paid meal expenses for AIM employees of $288 in 1994, $390 in 1995, and $322 in 1996.  AIM reimbursed those amounts to petitioner and deducted one-half, or $144 in 1994, $195 in 1995, and $161 in 1996.  Respondent contends that AIM is not entitled to the deductions and that those amounts are constructive dividends to petitioner.  We disagree.

A taxpayer may deduct meal expenses under section 162 if they are ordinary and necessary business expenses and if he or she meets the substantiation requirements of section 274(d). Moss v. Commissioner, 758 F.2d 211, 212 (7th Cir. 1985), affg. 80 T.C. 1073 (1983).  Petitioners have met these requirements. Petitioner paid these expenses for meals eaten by AIM's employees working overtime at jobsites.  Thus, AIM may deduct its reimbursement to petitioner of $288 in 1994, $390 in 1995, and $322 in 1996 for meal expenses.  Those amounts are not constructive dividends to petitioner.

G.   Travel Expenses

AIM deducted $4,200 more than respondent allowed for 1994 for travel expenses by AIM employees.  Petitioners contend that AIM properly deducted the $4,200 because Mrs. Boler incurred

travel expenses running errands for AIM.  We disagree that AIM may deduct Mrs. Boler's travel expenses.  A taxpayer may not deduct travel expenses unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement, the amount, time and place, and business purpose of the expense.  Sec. 274(d)(4).  Petitioners offered no evidence of the amount, time, place, and business purpose of Mrs. Boler's travel expenses on behalf of AIM.  Thus, petitioners have not complied with section 274(d)(4) as to the claimed deduction in 1994 based on Mrs. Boler's travel expenses.[7]

H.    Reimbursements Based on Undescribed Journal Entries

Petitioners contend that AIM may deduct the following expenses coded in AIM's journals:  $1,254 as GJ1 18308, $600 as GJ1 00172, and $480 as GJ1 001740 (the coded expenses at issue), and reimbursed to petitioner in 1995.  Petitioners contend that Scott incurred, and petitioner paid the coded expenses at issue as, travel expenses relating to a job that Scott did for AIM in Pine Hill, Alabama.  However, petitioners offered no evidence to support that contention.  Petitioners offered no evidence of the time, place, or business purpose of the alleged travel expenses.

---

[7] Respondent did not determine and does not contend that the $4,200 amount is a constructive dividend to petitioner.

Thus, petitioners have not met the requirements of section 274(d). Thus, we conclude that AIM may not deduct the coded expenses of $1,254, $600, and $480.

Respondent conceded that the coded expenses of $600 and $480 are for lodging expenses of AIM's employees other than the Bolers and thus are not constructive dividends to petitioner. However, we conclude that the coded expense of $1,254 is a constructive dividend to petitioner because petitioners have not shown otherwise.

I.   Whether Petitioners Are Liable for the Accuracy-Related Penalty Under Section 6662(a) for Negligence

Petitioners contend that they are not liable for the accuracy-related penalty for negligence under section 6662(a) because they reasonably relied on their accountants. They also contend that they had an honest misunderstanding of the law as to all issues.

Petitioners are not liable for the accuracy-related penalty for negligence with respect to matters on which they prevailed here. They are also not liable for the accuracy-related penalty with respect to the $17,532 AIM claimed as costs of goods sold because they are inexperienced in tax accounting matters and they reasonably relied on the advice of two accountants on this issue. We conclude, however, that petitioners were negligent with respect to: (1) The disallowed interest deductions; (2) the

disallowed deductions for reimbursements of expenses for which petitioners lacked substantiation; (3) the constructive dividends to petitioner; and (4) the items they conceded. The Bolers did not show good faith with regard to the claimed interest payments because they offered no records or other documentary evidence (other than the promissory note) of petitioner's alleged loan to AIM. There is no evidence about what information they gave their accountants or how the accountants advised them to treat the claimed interest payments or other items on which they did not prevail. Petitioners did not show that their reliance on their accountants explains their failure to keep adequate records for AIM or the fact that AIM claimed business deductions for its reimbursement of some of the Bolers' personal expenses.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.